USA PETROLEUM CORPORATION

v.

The UNITED STATES.

No. 643–83C.

United States Claims Court.

Oct. 25, 1985.

Sara D. Schotland, Washington, D.C., for plaintiff.

Eva M. Plaza and Thomas W. Petersen, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant; Elizabeth Diesselhorst, of counsel.

Alan V. Washburn, Washington, D.C., for third party GT & MC, Inc.

Donald C. Holmes, Jr., Washington, D.C., for third party Dravo Utilities Constructors, Inc.

Buel White, Washington, D.C., for third party Parsons-Gilbane Associates.

W. Bruce Shirk, Washington, D.C., for third party Apex Oil Co.

## OPINION

MARGOLIS, Judge.

The plaintiff, USA Petroleum Corporation [USA], brings this action to set aside the final decision of a government contracting officer and to recover $5,000 paid under protest pursuant to that decision. The defendant United States seeks to uphold the contracting officer's decision and to recover an alleged overpayment of $364,948.03 from USA.

Jurisdiction is founded on the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1), and the Federal Courts Improvement Act of 1982, 28 U.S.C. § 1491(a)(2). Both parties have moved for summary judgment based upon stipulated facts. Third parties GT & MC, Inc. and Dravo Utilities Constructors, Inc. filed oppositions to the motions for summary judgment.

## FACTS

In 1978, as part of its program to build a strategic oil reserve, the Government commissioned the construction of the St. James oil receiving terminal on the west bank of the Mississippi River, approximately halfway between New Orleans and Baton Rouge, Louisiana. The terminal, which is Government owned and contractor operated, comprises six large, cylindrical petroleum storage tanks and two receiving lines. Each receiving line connects the tanks to one of two docks on the river.

On October 31, 1980, USA entered into contract No. DLA600–81–C–5005 with the Defense Fuel Supply Center [DFSC] of the Department of Defense. USA agreed to supply DFSC with approximately two million barrels of Alaska North Slope crude oil, f.o.b. destination, at the Government's St. James terminal in Louisiana in exchange for an equal amount of Government owned Naval Petroleum Reserve crude oil produced at Elk Hills, California on a "barrel-for-barrel" basis. The contract provided for payment to be based on quantities determined by shore tank measurements or meter readings. Since the St. James facility was not equipped with meters, shore tank measurements were used.

Shore tank measurements at St. James are accomplished by tank gauge readings which essentially measure the height of petroleum in a tank. By comparing gauge readings before and after vessel discharge, the amount of oil delivered can be calculated. Individual calibration tables called "strapping tables" are employed to account for the internal features of each tank. These tables are used to convert the tank gauge readings to barrels of oil delivered.

Unfortunately, the strapping tables used in the shore tank measurements at the St. James terminal contained errors that affected the accuracy of the delivery figures.* Neither party had actual knowledge of the errors at the time the contract was negotiated.

Both parties cooperated in taking the quantity measurements and concurred in the results. The tank gauge readings for each shipment were carefully performed, as were the strapping table calculations to convert from tank gauge readings to barrels of oil. Nevertheless, an unusual pattern emerged.

During the course of performance, a number of vessels arriving at the St. James

---

* The tables were prepared and certified by E.W. Saybolt Company, Inc. [Saybolt] pursuant to a subcontract with Emile M. Babst Company, Inc. Babst was a subcontractor of Parsons-Gilbane Associates—the government contractor who constructed the terminal.

terminal were seemingly discharging more oil than was stated on their bills of lading. Such apparent gains in cargo are not common in the petroleum industry, though they can be caused by such factors as understated bill of lading quantities, discharge of oil already on board the vessel at the time of loading, and errors in quantity calculation at loading or discharge. Any consistent record of apparent gains is unusual, especially since factors such as spillage, evaporation, and tank clingage remaining in the vessel after discharge, normally produce real, in-transit cargo losses.

The unadjusted gain or loss figures for the six oil deliveries made by USA are approximately as follows:

| DATE | AMOUNT OF OIL IN BARRELS BELIEVED DISCHARGED | GAIN/LOSS AMOUNT OVER BILL OF LADING |
|------|------|------|
| 11–26–80 | 331,599 | 1,286 GAIN |
| 12–20–80 | 320,917 | 177 LOSS |
| 1–4–81 | 451,119 | 1,936 GAIN |
| 1–21–81 | 263,136 | 1,426 GAIN |
| 2–5–81 | 264,679 | 980 GAIN |
| 2–6–81 | 368,241 | 2,173 GAIN |
| TOTAL | 1,999,691 | 7,624 GAIN |

After the third delivery by USA was completed on January 4, 1981, the Government quality assurance representative, Daniel Hickman, became concerned. The initial Tanker/Barge Material Inspection and Receiving Report (DD–250–1) stated that the amount of oil delivered was approximately 451,119 barrels. This amount exceeded the vessel's bill of lading figures by approximately 1,900 barrels. At the time, only seven ships had been received at the terminal since it began operating, and this was the fourth ship to show an apparent gain in cargo.

When USA's next shipment posted a gain of 1,426 barrels on January 21, 1981, Hickman insisted on using the bill of lading figures, rather than the shore tank measurements, on the acceptance reports. Hickman subsequently relented when the shipper protested and his supervisor directed that shore tank measurements be used as required by the contract.

About the time USA's last shipment was unloaded on February 6, 1981, Hickman's concerns were shared by others at the terminal, and the cargo gains were discussed at weekly meetings. According to those present, it was first suspected that unreliable bill of lading figures were the source of the apparent overages. The oil on each vessel had been trans-shipped from supertankers in Panama to smaller vessels that could navigate the Mississippi; terminal personnel thought that the Panamanian bill of lading figures were understated. Until a more definite answer could be obtained, terminal personnel were reminded to be meticulous in their duties to eliminate possible sources of error.

In April 1981, well after USA had completed its last delivery, the mistaken bill of lading theory was disproved when vessels with no connection through Panama showed gains in cargo. Terminal personnel then suspected that the problem was at the St. James terminal. Having eliminated other possible explanations, Hickman wrote to the terminal operator on April 29, 1981 indicating that he suspected error in the strapping tables. By May 8, 1981 Saybolt confirmed that the roof weights used in the tables were incorrect.

The roof weight errors were only part of the problem. In July 1981 Saybolt discovered that the locations of the roof critical zones (the region in a tank where the roof begins to float as the tank is filled) were also incorrect. Accurate tables were finally provided in November 1981 after numerous revisions.

Meanwhile, on October 30, 1981, six months after the first errors were discovered and three months after the roof critical zone errors were discovered, the Government notified USA that the St. James figures were inaccurate and that an adjustment would be required. The final decision of the Contracting Officer sought an adjustment of $364,948.03 from USA. USA paid $5000 under protest and brought this action.

## DISCUSSION

### A. ESTOPPEL

■ USA asserts that the Government should be estopped from recouping the overpayments because the Government knew that USA was paying its suppliers on the basis of the shore tank measurements and failed to notify USA of its suspicions about the integrity of the measurements. The requisite elements of estoppel are:

1) The party to be estopped must know the facts;

2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

3) the latter must be ignorant of the true facts; and

4) he must rely on the former's conduct to his injury.

*Pacific Gas & Electric Co. v. United States*, 3 Cl.Ct. 329, 340 (1983), *aff'd without opinion*, 738 F.2d 452 (Fed.Cir.1984).

■ These requirements are not fulfilled in the present case. The Government did not know the facts; it merely suspected a problem. For months the Government believed that the gains were due to erroneous bill of lading figures provided in Panama and that the shore tank measurements at the St. James terminal were accurate.

Assuming that Hickman's concerns could be attributed to the Government, the failure to inform USA of mere concerns or suspicions is certainly not such egregious conduct to invoke estoppel against the Government. *See Lavin v. Marsh*, 644 F.2d 1378, 1382–83 (9th Cir.1981).

Were estoppel appropriate, it would not apply to overpayments made on vessels arriving on or before January 4, 1981, when Hickman first became concerned. Estoppel also would not apply to vessels arriving after USA knew or should have known that the shore tank figures were unreliable. *Cf. Alpena Savings Bank v. United States*, 8 Cl.Ct. 249, 252 (1985) (reliance must be reasonable). Five out of six oil deliveries by USA showed a gain over the bill of lading figures. Since USA has stipulated that any continued pattern of apparent cargo gains is unusual and does not dispute that on January 21, 1981, Hickman attempted to use bill of lading figures rather than shore tank measurements on the acceptance reports, USA has not shown that it reasonably relied on the shore tank measurements throughout performance.

### B. ACCEPTANCE

USA insists that the inspection and acceptance clause of the contract precludes the Government from reopening the transaction once it has inspected, accepted, and paid for the cargoes. This clause states that "[e]xcept as otherwise provided in this contract, acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud." Contract, Clause I5.01(d).

The Armed Services Board of Contract Appeals has indicated that recovery for a shipment insufficient in quantity might be precluded absent a warranty clause that survives acceptance. *Garrity Co.* ASBCA No. 12174, 67–2 BCA ¶ 6,586 (1967). Similar implications are found in other cases involving the inspection and acceptance clause. *See American Edible Oil Co.* AGBCA No. 353, 76–2 BCA ¶ 12,074 (1976); *see also Allison Honer Co.* ASBCA No. 11732, 68–2 BCA ¶ 7,273 (1968). However, because acceptance is not conclusive as to latent defects, it is unnecessary to decide whether the inspection and acceptance clause precludes recovery for defects in quantity.

A latent defect has been defined as one that would not be discovered by reasonable inspection. *Kaminer Construction Corp. v. United States*, 203 Ct.Cl. 182, 191, 488 F.2d 980, 984 (1973). While quantity is generally considered a patent characteristic, where defects in quantity can remain undetected even after a reasonable inspection, they are latent defects.

The manner for determining the quantity of oil received was specified in the contract. Although quantity determinations were made pursuant to these requirements, the results were inaccurate. The Court finds that the inspections performed were reasonable and that a reasonable inspection under the circumstances would not have revealed the quantity defects.

The parties concluded that oil of a certain quantity had been delivered when, in fact, it had not been. As with all latent defects, an inadequacy occurred despite a reasonable inspection. Thus, even if the inspection and acceptance clause does apply, it would not preclude the Government from seeking a monetary adjustment for the latent defects present here.

## C. RESTITUTION

USA asserts that equitable considerations such as the absence of unjust enrichment preclude restitution of any overpayment. However, where monies have been wrongfully, erroneously or illegally paid from the public treasury, the Government has a strong interest in recouping such funds. *See Fansteel Metallurgical Corp. v. United States*, 145 Ct.Cl. 496, 500, 172 F.Supp. 268, 270 (1959); *see also, Heckler v. Community Health Services*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Despite USA's alleged reliance on the shore tank measurements, restitution in this instance would not be inequitable or unjust. USA was the original recipient of the overpayment; its reliance was, at best, questionable; and it has direct recourse against its suppliers. *Cf. Park Cities Van Lines, Inc.* ASBCA Nos. 20431, 21527, 78-2 BCA ¶ 13,502 (1978) at 66,159 (party to

contract can sue principal if party is required to refund overpayment).

Moreover, the Government's right to recoup the overpayment is established by the latent defect provision of the contract. USA cannot escape the terms of its contract by asserting the absence of unjust enrichment.

## D. RISK OF LOSS

The Request for Proposal [RFP] for the contract provides that once the crude oil delivered by USA passes the permanent hose connection at the terminal, the risk of loss passes to the Government. RFP, Section H54.04(g). Based on this provision and others of the contract, USA argues that the Government contractually assumed the risk of quantification error.

The risk of loss provision contemplates actual losses or damage to the "crude oil *delivered*" (emphasis added). The Court is not convinced that this provision or others contemplate losses incurred because goods were never delivered.

The parties' conduct at the terminal indicates that responsibility for the measurement process was shared. (Defendant's Cross Motion for Summary Judgment, Appendix, Ex. 15.) The measurements were normally witnessed by a Government quality assurance representative, representatives of the vessel, the St. James terminal contractor, and the contractor supplying the crude oil. In addition, the Government reserved the right to revise the quantity figures if errors were made:

> *I-702 Corrected DD Form 250-1.* When errors are made in entries on the form which would affect payment or accountability, corrected copies shall be made. Entries corrected shall be encircled on all copies and the form plainly identified as a "CORRECTED COPY." The statement "Corrections Have Been Verified" shall be entered in Block 26 with the authorized Government representative's dated signature directly below. Distribution of the certified corrected copy shall be made to all recipients of the original distribution.

Defense Acquisition Regulations, Appendix I–702.

The Court believes that the risk of such error was allocated to neither party and that both parties operated under the mistaken assumption that the measurements were accurate. In such a case, plaintiff's restitution to the Government of the mistaken overpayments is appropriate. Restatement, Contracts (2d) § 158 (1981).

As noted earlier, the contract provides that adjustments in payment can be made if latent defects are discovered. In this case, the Government attempts to do nothing more than exercise its rights under the contract. The notice provided USA by the Government was both timely and adequate to accomplish this purpose.

The Court has considered the plaintiff's other arguments but found them unpersuasive.

### CONCLUSION

Accordingly, after oral argument, plaintiff USA's motion is denied, and the defendant's motion is granted, except as to the issue of damages. The Court will schedule further proceedings within the next 30 days with regard to the issue of damages.