NICHOLS, Senior Circuit Judge.
 

 USA Petroleum Corporation (USA Petroleum or contractor) appeals from the judgment of the United States Claims Court, reported at 9 Cl.Ct. 97 (1985), in which the Claims Court granted summary judgment for the government, concluding that the government is entitled to recoup over-payments erroneously made to the contractor. We vacate and remand.
 

 Background
 

 Knowledge is presumed of the full and detailed statement of the facts contained in
 
 *623
 
 the Claims Court opinion, 9 Cl.Ct. at 98-100. The following is a summary of the relevant facts, and as required in summary judgment cases, resolves no disputed issues of fact against a party opposing judgment.
 

 USA Petroleum entered into contract No. DLA600-81-C-5005 with the Defense Fuel Supply Center (DFSC) of the Department of Defense in October 1980 to supply approximately two million barrels of Alaska North Slope crude oil to the government’s St. James strategic oil reserve facility in Louisiana. The contract provided that payment would be based on quantities delivered and that the government would determine the quantity delivered according to two alternative methods, one of which was tank gauge readings. At the time of each delivery, the quantity of oil delivered was determined using “strapping tables,” which converted tank gauge readings to barrel quantities. The strapping tables were supplied by the DFSC and entirely within their control, although they were created for the DFSC by a third party subcontractor, E.W. Saybolt, Inc. (Saybolt).
 

 The strapping tables were inaccurate and erroneously reported that more oil was delivered than actually deposited. The government quality assurance representative, Daniel Hickman, noted from USA Petroleum’s first oil shipment in November 1980, that the measured amount differed from the amounts specified on the bills of lading. A gain in oil cargo volume is highly unusual. Typically an oil cargo loses a small amount of volume through spillage, evaporation, and tank clingage. Concern grew at the terminal after USA Petroleum’s third delivery because it was the fourth delivery of oil to the facility since opening that showed a gain in cargo. The three succeeding deliveries by the contractor also reflected a gain in cargo. By the time the last USA Petroleum cargo was unloaded in February 1981, concern was widespread among the appropriate staff about the discrepancies in oil quantity determinations. This recurring problem had become a regular topic of discussion at the weekly St. James terminal staff meetings.
 

 At first, the terminal staff suspected that the bills of lading were incorrect. In April 1981, the theory was disproved when, after the arrival of vessels of different origins, the same measurement problem recurred. After eliminating all other possible sources of error, Hickman wrote to the terminal operator on April 29,1981, stating he suspected an error in the strapping tables. The overpayment was then discovered through checking by Saybolt in May 1981. In October 1981, six months after Saybolt confirmed the measurement system defects, the government notified USA Petroleum that a refund would be required, later determined to be $364,948.03 by the final decision of the contracting officer. The contractor says it made corresponding overpayments to its suppliers and that they cannot now be recaptured.
 

 The Claims Court rejected the various contractual and equitable grounds for recovery presented by the contractor and granted summary judgment for the government, concluding that (1) the contractor failed to meet the elements of estoppel and restitution was due because the government only “suspected” a problem with the strapping tables and did not “know” the true source of the problem; (2) the contractor failed to show reasonable reliance on the government’s payments; (3) relief is not available to the contractor because the quantity problem was a “latent defect” that, under the contract, excuses the government from being bound by acceptance; (4) risk of loss did not pass to the government because the acceptance provision only applies to oil delivered; and (5) risk of loss relating to the measurement of oil was shared mutually.
 

 Analysis
 

 I
 

 We do not consider the latent defect argument because we think in its context the clause most likely refers to quality defects rather than errors in quantity measurement. The key and undisputed fact in this case is that the government was contractually responsible for providing the measurement means for the St. James ter
 
 *624
 
 minal, whose readings the contractor was bound to accept. These means were entirely within the control of the government and the involvement of the contractor in the measurement process was limited to observing measurements made using the tables. The losses involved in this case, therefore, relate exclusively to the defect in the tables provided by the government. The relevant portion of the contract, clause II.06(a)(ii), is as follows:
 

 [Q]uantity shall be determined on the basis of receiving shore tank measurements or meter readings. The Contractor shall have the right to have a representative present to witness the delivery and measurement of such quantity.
 

 App. at 109.
 

 This case is analogous to
 
 United States v. Spearin,
 
 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed.2d 166 (1918). In
 
 Spearin,
 
 the contractor agreed to construct a dry dock at the Brooklyn Navy Yard in accordance with detailed plans and specifications provided by the government. The contract also specified a plan to relocate a portion of a brick sewer than on the site of the proposed dry dock. The contractor complied completely with the government’s plans for relocation of the sewer. After approximately one year after the relocation, a second sewer, which was connected with the first, overflowed to the one relocated and flooded the dry dock. A dam in the second-connected sewer caused the flooding. The government did not mention the presence of this dam in the contract specifications or otherwise warn Spearin of this problem, even though flooding had occurred in the past.
 

 The Court attributed the losses to the government and stated what is now commonly referred to as the
 
 “Spearin
 
 doctrine”:
 

 [I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.
 

 Id.
 
 at 136, 39 S.Ct. at 61.
 

 The Federal Circuit and the former Court of Claims have applied this doctrine.
 
 See, e.g., Dewey Electronics Corp. v. United States,
 
 803 F.2d 650, 658 & 658 n. 12 (Fed.Cir.1986) (citing for the same point
 
 Ordnance Research, Inc. v. United States,
 
 609 F.2d 462, 479, 221 Ct.Cl. 641 and
 
 La Crosse Garment Manufacturing Co. v. United States,
 
 432 F.2d 1377, 1384, 193 Ct.Cl. 168.
 

 The Court in
 
 Spearin
 
 further explained its decision as finding an implied warranty:
 

 [T]he insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that, if the specifications were complied with, the sewer would be adequate. This implied warranty is not overcome by the general clauses requiring the contractor, to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance. The obligation to examine the site did not impose upon him the duty of making a diligent enquiry into the history of the locality with a view to determining, at his peril, whether the sewer specifically prescribed by the Government would prove adequate. The duty to check plans did not impose the obligation to pass upon their adequacy to accomplish the purpose in view.
 

 Id.
 
 at 137, 39 S.Ct. at 61 (citations omitted).
 

 The instant case is similar to
 
 Spearin
 
 and we believe it controls the result. The government in this case required measurement with devices it provided, akin to the government’s provision of design specifications in
 
 Spearin.
 
 USA Petroleum, like
 
 Spearin,
 
 complied fully with the terms of the contract. USA Petroleum was not negligent in any respect and, in keeping with
 
 Spearin,
 
 there was no obligation on the part of the contractor to check independently the accuracy of the strapping tables. We conclude, applying the
 
 Spearin
 
 doctrine, that the government breached its implied warranty to provide accurate strapping tables and is responsible for the consequences of its breach, so far as prejudicial to its contractor. Having concluded that the government is responsible for loss under the
 
 Spearin
 
 doctrine, we need not reach the other grounds for possible government responsibility presented by the
 
 *625
 
 contractor and discussed by the Claims Court.
 

 II
 

 While there is a breach, there is no legal money claim by either side against the other. The government asserts a right to recover its overpayment under the equitable doctrine of restitution. This invites inquiry whether the contractor has any defenses, legal or equitable. Of course, legal and equitable theories may be considered concurrently pursuant to the elimination of the distinction between law and equity. Fed.R.Civ.P. 2.
 
 See also
 
 2 J. Moore, Federal Practice ¶ 2.06 (2d ed. 1986).
 

 The Claims Court cites authority of the Supreme Court and the former Court of Claims for the observation that there is a strong policy interest in recovering mispaid public funds, 9 Cl.Ct. at 101, and we agree that, as a general matter, there is a strong government interest in recovering such public funds.
 
 See, e.g., United States v. Wurts,
 
 303 U.S. 414, 416, 58 S.Ct. 637, 638, 82 L.Ed.2d 932 (1938). The government may recoup funds from USA Petroleum in restitution. Equitable recovery in restitution is restricted, however, by principles of estoppel. The equitable defense of estoppel is available to parties contracting with the government and requires a case-by-case determination designed to avoid injustice.
 
 Heckler v. Community Health Services,
 
 467 U.S. 51, 59-61, 104 S.Ct. 2218, 2223-24, 81 L.Ed.2d 42 (1984).
 

 The Claims Court set out the traditional elements of estoppel below, but without guidance by the
 
 Spearin
 
 doctrine, which the court apparently did not notice, though the case was cited:
 

 1) The party to be estopped must know the facts;
 

 2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;
 

 3) the latter must be ignorant of the true facts; and
 

 4) he must rely on the former’s conduct to his injury.
 

 9 Cl.Ct. at 100 (citation omitted).
 

 The Claims Court concluded that USA Petroleum failed to establish that the government’s failure to inform the contractor of its doubts regarding measurement was sufficiently egregious to meet the “know the facts” standard of part one of the above-cited standard. The Claims Court also concluded that the contractor had not established reasonable reliance. We disagree.
 

 As the facts discussed earlier show, the government was aware of a problem with the measurement of oil delivered at the St. James area over a period of many months and many deliveries. The matter even became a subject of discussion at the terminal’s weekly meetings. There was no notice given to the contractor of the problem, however, and word did nor reach the contractor until six months after the government conclusively established that a portion of the measuring system was problematic. During all this time the contractor, as might be reasonably anticipated, paid its suppliers in accordance with its obligations.
 

 We do not accept the conclusion that the government merely had a “suspicion” and therefore did not act egregiously for purposes of estoppel. Although the government did not determine the exact nature of the problem until after the last delivery, error in the strapping tables, although rare, was obviously not outside the realm of possibilities as that problem was eventually considered. Certainly the government’s failure to inform the contractor of the problem after the pattern of the problem emerged was inequitable. In addition, the six-month gap between determination that there was a defect in measurement and notification of the contractor that tables were inaccurate was egregious. These actions are collectively sufficient to invoke estoppel under these circumstances. However, that an overpayment results from a contract breach by the payor, is anomalous, and we do not wish to be understood as holding that anything more is required for the estoppel than that there was
 
 *626
 
 a breach, and it was the cause of the overpayment.
 

 We also reject the Claims Court’s conclusion-that the contractor failed to establish reasonable reliance. The facts support the conclusion that the contractor was not aware of a problem with the tables. The firm’s payment of suppliers in a timely fashion was reasonable. We note that the government has not argued in this case that the contractor’s payments to its suppliers based on measurement information provided by the government was unreasonable.
 

 The conclusion we reach is that USA Petroleum has established a case in which estoppel against the government is appropriate. In reaching this conclusion, we emphasize that the contractor’s conduct was in no way inequitable in its dealings with the government. This case is distinguishable from
 
 Community Health Services
 
 on this point.
 

 In
 
 Community Health Services,
 
 the Court considered the contractor’s reliance on inaccurate oral advice given by a Medicare manager on the interaction of certain reimbursement provisions of the Medicare and Comprehensive Employment and Training Act programs. The advice given to Community Health Services resulted in erroneous reimbursement to the contractor by Medicare. The contractor used these additional funds to expand health services. Thereafter, the government reviewed the oral advice through formal channels and concluded that the contractor had received overpayments.
 

 The Court rejected the estoppel argument in
 
 Community Health Services,
 
 emphasizing the contractor’s responsibility to ascertain the legal requirements of Medicare reimbursement from the appropriate policymaking sources using the correct channels.
 
 Community Health Services,
 
 467 U.S. at 64, 104 S.Ct. at 2226. The Court also placed great emphasis on the informal oral nature of this advice and noted the strong public policy favoring reduction to writing of official advice.
 
 Id.
 
 at 65, 104 S.Ct. at 2227. The Court concluded that the contractor’s reliance was not reasonable and held that the organization had not met the traditional elements of estop-pel.
 
 Id.
 
 at 61, 66, 104 S.Ct. at 2224, 2227.
 

 In the case at hand, the contractor was not negligent and dutifully followed the terms of the contract. The case at bar is more analogous to
 
 Broad Avenue Laundry and Tailoring v. United States,
 
 681 F.2d 746, 231 Ct.Cl. 1. In
 
 Broad Avenue Laundry,
 
 the contracting officer purported to modify an ongoing contract to require payment of higher local wage rates negotiated by the contractor and employees’ union, and approved by the Labor Department as “prevailing” rates. This determination was wrongly applied to wage rates paid in performance of a contract already in effect. The increase negotiated was contingent on the government absorbing the added labor costs. The contracting officer misinterpreted the law relevant to the granting of wage increases in government service contract settings. After the modification, Broad Avenue Laundry applied for an appropriate contract price adjustment. Two weeks before the end of the contract, the contracting officer’s successor, now aware of the mistake, disallowed the price adjustment.
 

 The court in
 
 Broad Avenue Laundry,
 
 after holding that the contracting officer responsible for the erroneous modification had acted within the scope of her authority, was not bound by decisions such as
 
 Federal Crop Insurance Corp. v. Merrill,
 
 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed.2d 10 (1947), holding the government not bound by official speech outside the scope of the speaker’s authority. The court in
 
 Broad Avenue Laundry
 
 focused on the nature of the contractor’s behavior during the contract.
 
 Broad Avenue Laundry,
 
 631 F.2d at 748-49. The contractor had, the court noted, complied fully with the terms of the contract requiring compliance with the contract terms and modifications and the government was therefore estopped from asserting that it was not responsible for the errors in modifications complied with by the contractor.
 
 Id.
 
 The court noted:
 

 Payment of prevailing wages is one of the services required of petitioner by the
 
 *627
 
 contract. Performance of laundry service is another. Suppose the contracting officer decided to order some particular laundry service in a mistaken belief that the contract called for it. The order, if made with requisite formality, would be valid and effective even though based on a mistake of law. The contractor would under the disputes clause * * * be required to comply, perform the demanded service, and prosecute a claim for a constructive change order under disputes clause procedure. * * * It [the order to provide another laundry service] was valid and effective to impose on the contractor a legal duty to obey the order, and on the government to pay for the services if the interpretation were held erroneous. If he refused to obey, he would be in default. The government * * * cannot now turn around and take the wholly inconsistent position that it did not authorize the contracting officer to make legal mistakes.
 

 Id.
 
 at 748-49.
 

 The court, in concluding that the government was estopped from denying the claim involved in
 
 Broad Avenue Laundry,
 
 essentially concluded that the government may not deny responsibility for its own error in contracting where the contractor acts reasonably and complies completely with the terms of the contract. The case recognizes that the contractor has no legal choice but to comply with the contract.
 

 The case at hand is quite similar. USA Petroleum complied with the contract terms which foisted upon it the defective strapping tables provided by the government. There are no questions of reliance on mere oral advice from the government or other possible negligent acts by the contractor. It was a question of mistaken enforcement of the government’s contract rights. We follow
 
 Broad Avenue Laundry
 
 and conclude that the government is estopped from denying USA Petroleum’s claim.
 

 Ill
 

 The Claims Court did not reach the extent of detrimental reliance, the final element of estoppel. The contractor contends that provisions of its contracts with suppliers bar recovery from them and that letters directed to the suppliers regarding overpayment have established the refusal of suppliers to repay. On all the evidence of record we agree that USA Petroleum has been prejudiced by the government’s actions in this case. We are unable, however, to assess the extent of prejudice to the contractor and we remand to the Claims Court for this determination. The contractor’s assertions must be substantiated and reasonable, and the mere assertion by the suppliers that they need not repay the contractor will not suffice to establish prejudice. We hold that under the undisputed facts, the government is entitled to recover, as restitution, only that part of the overpayment which the contractor still has, or has paid over to its suppliers under circumstances permitting ready and easy recovery. The government may not recover such part of the overpayment as is required to cover losses consequent upon its breach. The judgment against the contractor is vacated and the cause is remanded for further proceedings consistent with this opinion.
 

 VACATED AND REMANDED.