Charles RICHMOND, Petitioner,

v.

**OFFICE OF PERSONNEL MANAGEMENT,**
Respondent.

No. 88–3243.

United States Court of Appeals,
Federal Circuit.

Dec. 2, 1988.

Charles Richmond, National City, Cal., pro se.

Robert A. Reutershan, Dept. of Justice, Washington, D.C., for respondent.

Before MAYER and MICHEL, Circuit Judges, and NICHOLS, Senior Circuit Judge.

MICHEL, Circuit Judge.

The decision of the Merit Systems Protection Board (board), Docket No. SF831L8710762, affirming the Office of Personnel Management's (OPM's or the agency's) ruling that Charles Richmond is ineligible for disability annuity payments after June 30, 1987 because, in view of his income in 1986, Mr. Richmond has been restored to earning capacity, is reversed and the case is remanded.[1]

*Background*

The facts and the applicable statutory law are undisputed. If a person receiving a disability retirement annuity is restored to an earning capacity fairly comparable to his former position, payment of the annuity shall be terminated 180 days after the end of the calendar year in which restoration occurred. 5 U.S.C. § 8337(d) (Supp.1988). Earning capacity is deemed restored if, in any single calendar year, the annuitant's earned income equals at least 80% of the current rate of pay for his former position. The agency discontinued disability annuity payments to Mr. Richmond, a retired[2] welder, WG–10, Step 4, formerly employed by the United States Department of the Navy, as of June 30, 1987. The payments were discontinued because Richmond's income during calendar year 1986 exceeded 80% of his former job's current base salary.[3]

---

1. Respondent's brief states without full explanation that, notwithstanding the agency's original decision that Mr. Richmond had been restored to earning capacity, the agency reinstated Richmond's disability payments as of January 1, 1988. Res. Br. at 4. Accordingly, the brief further states, the agency's original decision only denied Mr. Richmond benefits for the months July through December, 1987. Our decision then applies at least to the aforementioned 6 month period.

2. According to the agency's brief, Richmond retired from federal service on June 6, 1981.

3. As stated in the board's decision, the base salary for a WG–10, Step 4, as of December 31, 1986, was $23,771. Eighty percent of $23,771 is $19,016.74. Richmond reported an income of $19,936 for 1986.

Although application of the relevant statute to Richmond's case appears straightforward, Richmond argues, and indeed the board found in the face of no dispute by the agency, that Navy employee relations specialists misinformed Richmond that the measuring period for determining restoration was 2 years rather than a single calendar year. As late as January, 1986, Richmond received from the Navy written OPM notice that when, in each of 2 consecutive years, earned income equals at least 80% of the current rate of pay for the position retired from, earning capacity is deemed restored and the disability annuity is stopped.[4] Apparently the misrepresentation to Richmond resulted because prior to the enactment of Public Law 97–253, § 302(a)(1), effective December 31, 1982, the applicable statute, 5 U.S.C. § 8337(d), called for restoration to earning capacity to be determined based on earnings for "each of 2 succeeding calendar years." In reliance on the misinformation in this OPM letter, Richmond, who subsequent to his retirement was working as a bus driver, accepted additional hours of work in 1986. He believed that the additional hours of work, which he says are not normally available to him, would temporarily increase his income, but would not cause loss of his disability benefits.

In reviewing the agency's action, the board stated that "[a]lthough it is undisputed that appellant's former employer, the Department of the Navy, gave appellant misinformation upon which he relied, that agency was not the Office of Personnel Management (OPM)." Accordingly, the board held that OPM cannot be estopped from enforcing a statutorily imposed requirement for terminating disability retirement eligibility, and observed that Richmond should have sought and entertained information respecting continued eligibility only from OPM. Richmond appeals.

ISSUE

Whether on the facts and circumstances of this case the OPM is estopped from terminating Richmond's disability benefits because relying on an OPM letter he allowed his earned income in 1986 to exceed 80% of his former job's current base salary.

OPINION

We do not agree with the board's view that the agency cannot be estopped from discontinuing Richmond's disability benefits. In our view, the agency can be estopped because of the affirmative misconduct of the government in informing Richmond in writing in 1986 that his right to disability benefits would be maintained if Richmond's income did not exceed the 80% ceiling for 2 consecutive years. Richmond would have foregone the additional, temporary 1986 wages and maintained his eligibility for disability benefits had he not relied upon the out-of-date OPM letter given him by Navy employees whom he had no reason to believe were not providing him with accurate information.

We are aware of the long-established rule that ordinarily the government may not be estopped because of erroneous or unauthorized statements of government employees when the asserted estoppel would nullify a requirement prescribed by Congress, *see, e.g., Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (per curiam)[5] and that generally "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 63, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984). However, the Supreme Court has clearly left open the possibility that estoppel may be invoked against government agencies in some particular circumstances. In *Community Health Services,*

**4.** In response to Richmond's inquiries, petitioner was given a copy of Federal Personnel Manual Letter 831–64, Attachment 4, issued by OPM and containing the misinformation.

**5.** Government was not estopped from denying "mother's insurance benefits" to respondent who had failed to file for them because of erroneous *oral* advice of Social Security Administration field representative that she was ineligible.

the Supreme Court specifically declined an invitation to announce a flat rule that "estoppel may not in any circumstances run against the Government." *Id.* at 60, 104 S.Ct. at 2224. Instead the Court said:

> Though the arguments the Government advances for the rule [that estoppel may never run against the Government] are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government.

*Id.* at 60–61, 104 S.Ct. at 2224 (emphasis in original) (footnote omitted).

Since the Supreme Court's decision in *Community Health Services,* courts of appeals have determined whether, on the facts of a given case, estoppel should be applied against the government. Certain cases have determined that estoppel should apply. In *Fano v. O'Neill,* 806 F.2d 1262 (5th Cir.1987), Fano had asserted before the district court that the government was estopped from denying him permanent resident status since when he filed he met all requirements and was denied permanent residency only because the government had "recklessly and negligently" delayed processing his application and in the meantime, he became ineligible as over 21 years of age. *Id.* at 1265. The processing delay was in direct contradiction to the Service's Operations Instruction on which Fano had relied in filing his application just prior to his 21st birthday, and according to which such applications were to receive urgent processing. *Id.* at 1263. The district court granted summary judgment rejecting Fano's estoppel argument.

The court of appeals stated that, according to Supreme Court cases, in order for estoppel to apply, Fano had to show some sort of "affirmative misconduct" on the part of the government. *Id.* at 1265. The court further observed that "to state a cause of action for estoppel against the government, a private party must allege more than mere negligence, delay, in action or failure to follow an internal agency guideline." *Id.* In the court's view, Fano's allegations of reckless and negligent, and possibly even willful and wanton delay, could establish affirmative misconduct. Accordingly, the district court was required to allow Fano to develop his case through discovery since, if proven, his charges could support estoppel. *Id.* at 1266. The causes for the delay presented genuine issues of material fact possibly showing affirmative misconduct and giving rise to an estoppel.[6]

Our own decisions have also recognized the viability of government estoppel. In *USA Petroleum Corp. v. United States,* 821 F.2d 622 (Fed.Cir.1987), we stated "[t]he equitable defense of estoppel is available to parties contracting with the government and requires a case-by-case determination designed to avoid injustice." *Id.* at 625. In that case we made note of the traditional elements of estoppel as set out by the lower court:

1. The party to be estopped must know the facts;

2. he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

3. the latter must be ignorant of the true facts; and

4. he must rely on the former's conduct to his injury.

---

**6.** In our view, the decision in *Fano* is not undermined by the subsequent Supreme Court decision in *Immigration and Naturalization Service v. Pangilinan,* —— U.S. ——, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988). *Pangilinan* involved the respondents' recent application for citizenship under a special immigration statute that expired in 1946. *Id.* 108 S.Ct. at 2214. There was no indication that the respondents had relied on any misinformation from the government in waiting more than 30 years after the statute expired before petitioning for citizenship. Nonetheless, the Ninth Circuit ordered naturalization of the respondents. *Id.* at 2212. The Supreme Court held that under these circumstances it was improper to ignore the statutory provisions for determining eligibility for citizenship. *Id.* at 2216.

*Id.* We concluded that these elements of estoppel had been established by the contractor. Specifically, we observed that the government failed to conform quantities of oil it reported for payment purposes to the actual quantities it knew were delivered by the contractor. As a result of these discrepancies, the government overpaid the contractor for the oil, and the contractor in turn made unrecoverable overpayments to its suppliers. *Id.* at 623.

Additionally, the government waited for 6 months after it knew of the discrepancies to notify the contractor of the overpayments. *Id.* at 625. Based on these facts, we determined that the government was estopped from seeking restitution from the contractor. We pointed out that our result in *USA Petroleum* was not inconsistent with *Community Health Services,* which declined to apply estoppel against the government because there the contractor failed to ascertain legal requirements from "the correct channels" and in writing. *Id.* at 626. Our overall conclusion was that the contractor's right to rely on the government's continued written representations as to oil deliveries justified application of estoppel.

More recently, we discussed the application of equitable principles (although not explicitly "estoppel") to government action in *National Corn Growers Association v. Baker,* 840 F.2d 1547 (Fed.Cir.1988). *Corn Growers* involved a temporary provision in the Tariff Schedule that imposed a sixty-cent per gallon tariff on imported ethanol. *Id.* at 1549. When the Commissioner of Customs interpreted the new statute so as to exclude certain imported mixtures in part of ethanol, domestic ethanol producers protested. In response, the Commissioner reversed his prior ruling, deciding to apply the sixty-cent per gallon duty to the previously exempted mixtures. *Id.* In order to avoid unfairness, however, the Customs Service decided to allow importers who had relied upon the exemption to complete importation of their mixtures free of the applicable duty. *Id.* Corn Growers and others objected, questioning the authority of the Commissioner to limit equitably the application of the tariff provision. *Id.* at 1549–50.

We stated that the Commissioner, having fundamentally reinterpreted the law regarding the ethanol imports, was free not to give the new interpretation retroactive application. We took the view that to require the Commissioner to apply the subject provision as newly interpreted to all importations would be unfair. *Id.* at 1552. Having relied on the government's first stated view of the law, importers "should not be penalized" for following what the government said, based on its subsequent reinterpretation of the law. *Id.* Our decision in *Corn Growers* appears consistent with the cases listed in *Community Health Services* in which the court seemed to acknowledge that estoppel had been properly, although implicitly applied against the government. *See Community Health Services,* 467 U.S. at 60, n. 12, 104 S.Ct. at 2224, n. 12.

In *Frantz v. Office of Personnel Management,* 778 F.2d 783 (Fed.Cir.1985) our court itself implicitly applied estoppel against the government. We held that OPM may not deny benefits to individuals who have been affirmatively misled by agency officials as to those benefits. In *Frantz* the agency had rejected, as untimely, a late election of a survivor's annuity where an annuitant had earlier received erroneous information from the agency. Based on the misinformation, the annuitant had chosen not to elect to have her husband receive survivor benefits if she predeceased him. *Id.* at 784. An agency personnel counselor had given the annuitant the erroneous information orally and in writing by means of an agency-approved form. *Id.* We determined that under the circumstances and notwithstanding the subsequent sending of correct information to the annuitant, a reasonable person would at least have been confused as to the proper election. We held that the board's finding to the contrary was not supported by substantial evidence. *Id.* at 787. Accordingly, we ordered the agency to accept the annuitant's application amending her election as to survivor benefits, even though doing so

effectively nullified the filing deadline in the act.

▮ Based on the Supreme Court's acknowledgment that the estoppel against the government is not foreclosed and based on court of appeals rulings applying estoppel against the government, our view is that estoppel is properly applied against the government in the present case. Here, the traditional elements of private estoppel all have been met. The government knew that, subsequent to December 31, 1982, restoration to earning capacity must be determined by a beneficiary's earnings in a single calendar year. Furthermore, when the Navy personnel specialists informed Richmond orally and in writing, by way of an OPM letter, that eligibility was determined based on earnings in 2 successive calendar years, the government, acting through the specialists, obviously intended that Richmond accept the truth of the representations. Also, despite his diligence, Richmond remained ignorant of the true state of the law, and relied on the government's representations to his injury. His case is even more compelling than Frantz's because according to *all* the information the government had provided Richmond, he was safe in accepting what additional, temporary wages he could earn in calendar year 1986. Richmond thus did not get conflicting advice that could have confused him; he got consistent advice that misled him.

▮ With regard to establishing "affirmative misconduct," we conclude that the government's action in providing Richmond with an OPM letter which summarized a law which had been changed some 4 years earlier is sufficient "misconduct" for estoppel to apply. To provide such a letter to an individual who apparently made specific requests for current written information through what appeared to be the correct channels is reckless, at the very least. That it was "affirmative" conduct cannot be disputed.

▮ Nor may the government be heard to assert that Mr. Richmond should not have relied upon the OPM letter given him by Navy personnel specialists, but should have gotten his information solely and directly from OPM. First, Mr. Richmond did get information published by OPM itself, although the OPM letter was obtained from the Navy. Second, unless the government warns annuitants against making inquiries of their former agency of employment, it is simply not fair to prejudice their retirement or disability income because they communicated with their own agency. According to the record before us, no such warning was ever given to Mr. Richmond. In cases such as this where the government is properly subject to estoppel, it cannot avoid the consequences of estoppel simply because the agency which provided the OPM letter was not OPM.

▮ The facts here as to what reasonably appeared to be "correct channels" are quite different than in *Community Health Services.* There the party seeking to assert estoppel obtained oral advice from a private contractor acting as an agent for the government, not from government officials or employees, and from a private individual concerning what plainly was an agency-wide policy issue involving legal requirements. The court rejected reliance under these circumstances as unreasonable. 467 U.S. at 55–56, 61, 65, 104 S.Ct. at 2221, 2224, 2226.

Richmond, however, dealt with Navy personnel specialists who gave him a government-wide letter from OPM, the administering agency for disability annuities. It seems reasonable for him to have assumed that the OPM letter they gave him was both authoritative and current. He did.

On the particular facts of this case, all the elements of estoppel have been shown as has affirmative misconduct. In sum, our view is that Richmond's interest in "some minimum standard" of reliability "outweigh[s]" (*Community Health Services,* 467 U.S. at 61, 104 S.Ct. at 2224) the government's interest in avoiding estoppel and denying disability benefits to Richmond based on the 1 year rather than the 2 year period for determining continuing eligibility as affected by restoration to earning capacity.

It may be asked whether since in its most specific language in *Community Health Services*, 467 U.S. at 60, 104 S.Ct. at 2224, the Supreme Court merely left open the possibility of courts applying estoppel against the government, our holding here is permitted. But notwithstanding the absence of affirmative Supreme Court precedent, there can be no doubt that courts may and in fact do apply estoppel against the government. Courts of appeals, including our court, have estopped the government in varying factual contexts in cases such as *Fano* and *USA Petroleum, supra.*

█ If then estoppel is available against the government in proper cases, given proof of the traditional elements of private estoppel plus affirmative government misconduct, is its availability limited only to cases involving contracts? While our own decision in *USA Petroleum* was concededly a contract case, the Fifth Circuit's decision in *Fano*, dealing with immigration, clearly was not.

Rather than requiring the presence of a contract or some other earmark of a limited class of cases to which estoppel might apply, the logic of the landmark decisions leads to the conclusion that the most crucial consideration is the objective reasonableness of the reliance. *Community Health Services*, 467 U.S. at 64, 65, 104 S.Ct. at 2226, 2226. Thus, estoppel has been avoided where the individual relied only on oral advice (*Schweiker*, 450 U.S. at 786, 788, 101 S.Ct. at 1470, 1471); and where the advice came from persons who were not cloaked with the mantle of authority to speak for the government as to legal requirements (*Community Health Services*, 467 U.S. at 64, 104 S.Ct. at 2226). Neither of those limitations applies here.

█ It also may be asked if estoppel can ever be applied to award benefits to one who at least temporarily becomes statutorily ineligible to receive them. The answer, we believe, should depend on what caused the ineligibility. Here, Mr. Richmond was plainly eligible in 1981–86 and was receiving disability retirement checks. Again in 1988, he was apparently deemed eligible and again began receiving checks. As to 1987, it is undisputed that he properly received checks for the first 6 months, but was declared restored to earning capacity and thus ineligible as of July 1987 because of extra wages in 1986 that put him slightly over the income limit for calendar 1986.

Was his salary increased in 1986 to achieve restoration? No, he merely received additional wages for overtime that was not available in other years. Thus, this is not a case where, for example, an annuitant was offered a raise that would put him permanently over the limit, but asked the employer to decrease the raise in order to stay under the limit so as to maintain eligibility. Nor should we find bad faith or manipulativeness in Mr. Richmond's inquiry to the Navy. For one thing, the 80% figure as the measure of restoration of earning capacity (rather than 100%) guards against manipulation of salary levels. Further, it is undisputed here that the increase in income was but temporary.

Before accepting the overtime offered, Richmond inquired about the applicable period for measuring restoration. The OPM letter given him erroneously indicated the period was 2 years. Through nearly all of 1986, Richmond's income remained below the limit; he exceeded the annual income limit only because of the incorrect statement in the OPM letter, which led him to accept the unusual overtime. Since reliance on the government misstatement directly caused the temporary ineligibility, it seems quite unfair to conclude that because of it, estoppel is automatically unavailable. It would seem, rather, that this "but for" relationship presents precisely the situation where estoppel is most appropriate. That a statutory requirement is thereby effectively nullified in an individual case is no bar, as *Fano* shows.

█ Nor should its application here be avoided by rigid adherence to the axiom that everyone dealing with the government is presumed to know the law and thus to know not to rely on incorrect statements of government agents. In the context of corporations negotiating contracts with the

government, there is no reason to limit resort to this axiom. Government contractors typically know the government contracts business and they often have attorneys. In contrast, however, Mr. Richmond is not in the government annuities business and cannot reasonably be presumed to know the specific statutory provisions as they change from time to time. Nor is it likely that this former Navy welder who now drives a bus has attorneys to ask. Instead, he asked Navy personnel specialists. They provided him with the OPM letter. He relied on it. In so doing, Richmond relied not on incorrect advice from "government agents" (*Community Health Services,* 467 U.S. at 63, 104 S.Ct. at 2225), but on incorrect advice from the government itself. The OPM letter was obviously intended as guidance for all disability annuitants, was printed under OPM's letterhead, was addressed to "Heads of Departments and Independent Establishments," and was signed by the Acting Deputy Director. Was Mr. Richmond's reliance on it unreasonable? We think not. Was the government reckless in furnishing the superseded OPM letter? We think so.

Our decision is not a departure from our own or Supreme Court precedent. It simply reflects the specific facts in this case. They are sufficiently unusual and extreme that no concern is warranted about exposing the public treasury to estoppel in broad or numerous categories of cases. Estoppel, after all, being equitable, necessarily is based on preserving fairness on the specific facts of the case before the court.

## CONCLUSION

Accordingly, the decision of the board is reversed and the case is remanded to the board with instructions to direct the agency to issue the withheld disability benefits to Mr. Richmond.

## COSTS

Costs awarded to the petitioner.

REVERSED AND REMANDED

MAYER, Circuit Judge, dissenting.

There is no doubt that the Navy misinformed Richmond. Relying on the Navy's erroneous advice, he worked additional hours and increased his earnings above 80 percent of the pay of a government welder, his pre-disability retirement position, thereby relinquishing eligibility for benefits under the Civil Service Retirement Act. But the Navy's misinformation is no reason for the court today to estop the government from recognizing that Richmond was, in fact, restored to earning capacity, and was no longer eligible to receive a disability annuity. This decision contravenes the express mandate of Congress in 5 U.S.C. § 8337(d) (Supp.1988), and Supreme Court precedent.

I agree with the court that *Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984), left open the question of when, if ever, the government can be estopped from enforcing a validly promulgated statute. But this does not mean that we write on a clean slate. In *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981), a case strikingly similar to the one we decide today, Hansen sought a retroactive award of "mother's insurance benefits" under the Social Security Act. But for the erroneous advice and negligent behavior of a field representative of the Social Security Administration, she would have received benefits for the period in question. The field representative had failed to familiarize himself with an amendment, then in effect for a year and a half, which afforded benefits to Hansen. Moreover, the field representative failed to follow an internal agency claims manual which expressly required him to advise Hansen that she should file a written application. Had she been so advised, the representative's error would have been obviated, and benefits would have been forthcoming.

Nevertheless, the Supreme Court held that the field representative's "errors 'fal[l] far short' of conduct which would raise a serious question whether [the government] is estopped from insisting upon compliance with the valid regulation" requiring a writ-

ten application as a prerequisite to the disbursement of benefits. *Id.* at 790, 101 S.Ct. at 1472 (quoting *Montana v. Kennedy,* 366 U.S. 308, 314, 81 S.Ct. 1336, 1340, 6 L.Ed.2d 313 (1961)). The Court said that "'the duty of all courts to observe the conditions defined by Congress for charging the public treasury,'" *id.* 450 U.S. at 788, 101 S.Ct. at 1470 (quoting *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)), is not abnegated by the plea of an eligible applicant who has lost benefits because of the erroneous advice of a government employee. That was a more meritorious case than ours because Hansen would otherwise have been entitled to benefits, and she at least approached the administering government agency for guidance, which Richmond did not. But this was not sufficient.

*Community Health Services,* too, held that the government could not be estopped, in that case from recouping funds mistakenly disbursed, even though the error was a direct result of the repeated failure of an agent of the government to provide correct information, and to follow correct administrative procedures. 467 U.S. at 57, 104 S.Ct. at 2222. The Court identified respondent's inability to demonstrate that it had detrimentally relied on the government's misconduct as fatal to its claim. As in that case, Richmond's "detriment" is nothing more than "the inability to [ob]tain money that [he] should never have received in the first place." *Id.* at 61, 104 S.Ct. at 2224.

Both *Hansen* and *Community Health Services* observed that respondents had suffered no irreparable injury. In *Hansen,* "at worst, [the field representative's] conduct did not cause respondent to take action, ... or fail to take action, ... that respondent could not correct at any time." 450 U.S. at 789, 101 S.Ct. at 1471. And in *Community Health Services,* "respondent lost no rights but merely was induced to do something which could be corrected at a later time." 467 U.S. at 62, 104 S.Ct. at 2225. This is precisely Richmond's situation: his disability payments were fully restored when his pay fell below the statutory earnings threshold.

Until today, we followed those Supreme Court cases. In *Riggs v. Office of Personnel Management,* 709 F.2d 1486, 1488 (Fed.Cir.1983), for example, we relied on *Hansen* and held that OPM's erroneous ruling, and Riggs' consequent failure to meet a statutory precondition to entitlement, did not estop the government from enforcing the precondition and denying Riggs benefits.

The cases the court believes support its departure from precedent do not. *National Corn Growers Ass'n v. Baker,* 840 F.2d 1547 (Fed.Cir.1988), was restricted to the resolution of a jurisdictional issue, *id.* at 1550, and stands for nothing more than the unstartling proposition that "[t]he law is the law at the time of its existence, whether wrong or not, and 'practical men' have a right to rely on it at the time they perpetrate their actions." *Id.* at 1555. It says nothing about the quite different proposition advanced by the court today, that citizens are entitled to rely on what, in fact, is not the law.

In *USA Petroleum Corp. v. United States,* 821 F.2d 622 (Fed.Cir.1987), the company was *contractually bound* to accept information provided by the government. In breach of its express and implied obligations to USA Petroleum, the government knowingly "foisted upon" the company incorrect data. *Id.* at 627. Recognizing the extraordinary exigency created by a situation in which a company "has no legal choice" but to accept the information provided by the government and to perform accordingly, we held that "[t]he equitable defense of estoppel is available to parties contracting with the government...." *Id.* at 625. In contrast to this case, *USA Petroleum* follows the Supreme Court. *Hansen* acknowledges that a different analysis may be in order if "the Government had entered into written agreements which supported the claim of estoppel." 450 U.S. at 788 n. 4, 101 S.Ct. at 1471 n. 4.

In *Frantz v. Office of Personnel Management,* 778 F.2d 783 (Fed.Cir.1985), equitable estoppel was neither argued nor discussed.

I am willing to assume, as did the Supreme Court, that violation of "some minimum standard of decency, honor, and reliability" might estop the government, 467 U.S. at 61, 104 S.Ct. at 2224, but this envisions at least some form of egregious misconduct. Ours is not that kind of case. I also agree that it is deplorable that government employees paid to guide citizens through the bureaucratic maze sometimes fail to perform their duties responsibly, assuming that here it was the Navy's responsibility to advise on OPM's behalf, which is not beyond question. But it is axiomatic that "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Community Health Services*, 467 U.S. at 63, 104 S.Ct. at 2225.

It seems to me that this is a particularly inappropriate case for making a chasm out of the crack the Supreme Court left open in *Community Health Services*. In section 8337(d) Congress set out a statutory definition of "earning capacity" of general applicability, eliminating the necessity of repeated particularized investigations. Regardless of why it happened, Richmond both met the statutory test of restored earning capacity and demonstrated that he was, in fact, restored to earning capacity. Section 8337 is a generous and salutary provision. But Congress certainly did not intend that beneficiaries gerrymand their earnings to get extra money from the taxpayers. Obviously the statute is susceptible of that abuse, but the court should not encourage it by the novel device of government estoppel in a case like this.