**MELEX USA, INC. and Pezetel, Ltd., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 95–152.
Court No. 92–04–00298.**

United States Court of International Trade.

Aug. 25, 1995.

McDermott, Will & Emery, Washington, DC (Carl W. Schwarz, David J. Levine) for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, (Reginald T. Blades, Jr.); of counsel: Stephen J. Claeys, Attorney–Advisor, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

## MEMORANDUM OPINION

MUSGRAVE, Judge.

Plaintiffs, Melex USA, Inc. and Pezetel, Ltd. (hereinafter referred to as "Melex," "Pezetel" or Plaintiffs), move for judgment on the agency record, challenging the final results of the administrative review of antidumping announced by the International Trade Administration, U.S. Department of Commerce ("ITA" the "government" or "Commerce"), *Electric Golf Cars From Poland; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 10334 (March 25, 1992), as amended, *Electric Golf Cars From Poland; Amendment of Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 18129 (April 29, 1992). The review covered unliquidated entries during the period July 1, 1976 through June 10, 1980, and resulted in a 2.91% antidumping duty.

Specifically, plaintiffs contest Commerce's (1) assessment of antidumping duties upon Melex's pre-1980 entries after the ITC had revoked the finding of injury due to changed circumstances in 1980; (2) assessment contrary to statements made by Commerce officials outside of the Administrative review process; (3) use of the Spanish rate of inflation rather than the Polish rate of inflation for the adjustment of Spanish costs used in constructed value; (4) recalculation of Melex's credit expenses; and (5) use of petitioners' information to determine the costs of producing Melex's 4-wheel golf cars.

### *Background*

The original antidumping petition in this matter was filed on April 29, 1974, by Outboard Marine Corporation of Lincoln, Nebraska, then a domestic manufacturer of golf cars. Wytwornia Sprzetu Komunikacyjnego ("WSK"), a Polish state enterprise, mass-produced the golf cars (approximately 6,000 units per year) at a factory in Mielec, Poland. Pezetel (formerly known as "Pezetel, the Foreign Trade Enterprise of the Polish Aviation Industry") exported the product to Melex, a wholly-owned subsidiary of Pezetel, and to other, unrelated, firms.

On September 16, 1975, the Commission made a determination of injury which was published on October 21, 1975. 40 Fed.Reg. 49153. On November 18, 1975, the Department of Treasury published a finding of dumping of electric golf cars from Poland. *Antidumping—Electric Golf Cars from Poland,* 40 Fed.Reg. 53383.

The ITC's determination of injury remained in effect until June 11, 1980, when the ITC conducted a "changed circumstances review" and determined that the domestic industry would not be threatened with material injury if the antidumping finding on Polish electric golf cars was revoked. *ITC Changed Circumstances Determination* 45 Fed.Reg. 39581 (June 11, 1980).

On August 8, 1980, the Department of Commerce issued *Electric Golf Cars From Poland: Revocation of Dumping Findings; Antidumping Duties.* Fed.Reg. 52870, which stated: "Unappraised entries of electric golf cars from Poland, made prior to June 11, 1980, remain unaffected by this notice, and continue to be subject to appraisement under the antidumping duty finding." *Id.* at 52871.

On October 30, 1985, Melex requested that Commerce initiate an administrative review of Melex's entries between July 1, 1976 and June 10, 1980. Melex had requested this review in a timely fashion after the implementation of the Trade and Tariff Act of 1984, which provided that annual reviews would be conducted only upon the request of an interested party. Pub.L. No. 98-573. The regulation implementing the review-upon-request rule provided that outstanding entries would be liquidated as entered with antidumping duties assessed at the rate of the estimated cash deposit rate, or at the bond rate. *Plaintiffs' Brief* at 14.

Based on the new regulation, if it did not request a review, Melex faced an assessment at bonded rates ranging from 20 to 50 percent, for the unliquidated entries which had entered between 1976-1978. For nearly six years, no action was taken on Melex's request for a review of its unliquidated entries. *Plaintiffs' Brief* at 15.

On April 18, 1991, Commerce finally initiated an administrative review of the antidumping duty order on electric golf cars from Poland. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed.Reg. 15856. The period of review was July 1, 1976 through June 10, 1980. *Id.* On December 9, 1991, Commerce preliminarily determined that Melex sold golf cars at less-than-fair-value during the period of review. *Golf Cars from Poland; Preliminary Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 64239. It is the final results of this Administrative Review, as amended, which are now being challenged. The Court's jurisdiction over this matter is derived from 28 U.S.C. § 1581(c) (1988).

### Standard of Review

■ In reviewing injury, antidumping, and countervailing duty investigations and determinations, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), *quoting Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938). Substantial evidence supporting an agency determination must be based on the whole record. *See Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 464–65. The "whole record" means that the Court must consider both sides of the record. It is not sufficient to examine merely the evidence that sustains the agency's conclusion. *Id.* In other words, it is not enough that the evidence supporting the agency decision is "substantial" when considered by itself. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Id.* at 478, 488, 71 S.Ct. at 459, 464.

■ The interpretation of the laws administered by Commerce should be sustained if that interpretation is reasonable. *United States v. Zenith Radio Corp.,* 64 CCPA 130,

C.A.D. 1195, 562 F.2d 1209 (1977), *aff'd,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *American Lamb Company v. United States,* 785 F.2d 994 (Fed.Cir.1986). Furthermore, this Court should not reject the interpretation of a statute or regulation administered by an agency unless it has compelling reasons to do so. *Wilson v. Turnage,* 791 F.2d 151, 155–56 (Fed.Cir.1986), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986).

■ With regard to judicial review of an agency's construction of a statute it administers, the Supreme Court has held that absent direct Congressional instruction as to the precise question at issue, the question for the Court to decide is whether the agency's interpretation is based upon a permissible construction of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Where the agency's interpretation of a statute represents a reasonable accommodation of manifestly competing interests, it is entitled to deference. *Id.* at 865, 104 S.Ct. at 2792–93. Since Commerce administers the trade laws and its implementing regulations, it is entitled to deference in its reasonable interpretations of those laws and regulations. *PPG Industries, Inc. v. United States,* 13 CIT 297, 299, 712 F.Supp. 195, 198 (1989), *aff'd,* 978 F.2d 1232 (Fed.Cir.1992). This should not suggest the vacation of meaningful judicial review, but rather a recognition that administrative agencies must be permitted to effectively employ their administrative expertise in carrying out their legislative mandates. *Id.*

### Discussion

**A. Commerce's assessment of antidumping duties upon Melex's 1978–1980 entries after the ITC had revoked the finding of injury due to changed circumstances in 1980.**

Plaintiffs contend that the assessment of antidumping duties for the 1976–1980 entries is contrary to the GATT and U.S. law which require a current injury finding for antidumping duties to be assessed. *Plaintiffs' Brief* at 18. Although the ITC made a deter-

mination of injury in 1975, plaintiffs argue that because the ITC determined in 1980 that changed circumstances allowed the revocation of the finding of injury, the assessment after that finding is contrary to the GATT and U.S. law. Defendant argues that "Melex's interpretation would improperly cause the ITC's finding of no injury to become retroactive." *Defendant's Brief* at 14. In their reply brief, "plaintiffs stipulate to the prospective nature of revocations." *Plaintiff's Reply Brief* at 7.

This Court finds plaintiffs' argument to be unpersuasive. Plaintiffs seek an interpretation of prospectivity which is inconsistent with the meaning of that term as it was interpreted by the ITC Commissioners in the instant case. Plaintiffs' argument is founded on the assertion that the revocation of the finding of injury by the Commission in 1980 and the subsequent revocation of the antidumping order by Commerce in 1980 bars the levy against those entries which occurred before the effective date of revocation, June 11, 1980.

According to the statement of reasons of Vice Chairman Bill Alberger and Commissioner Michael J. Calhoun in the *Changed Circumstances Determination; Electric Golf Cars From Poland* of June 11, 1980, "[t]his review proceeding is the first to come before the Commission under the new Section 751 of the Tariff Act of 1930 (19 U.S.C. § 1675(b)).... Thus, new questions of statutory interpretation are presented in this proceeding." 45 Fed.Reg. at 39583. The Commissioners specifically considered whether their finding should be prospective:

> The standard chosen for a determination in a review investigation reflects the fact that an antidumping finding is in force. That finding subjects any sales at less-than-fair-value to special duties. In such circumstances, material injury to a domestic industry cannot be "by reason of" less-than-fair-value sales because the statutory remedy is already in place. Accordingly, a *prospective* test has been chosen for the Commission's rule—specifically, the threat of material injury test found in Section 735(b) of the Tariff Act, also referred to in Section 207.26(d) of the Commission's

rules. The threat of material injury standard focuses on *what could happen* to the domestic industry in the event that the antidumping finding were revoked and there was no mechanism for subjecting any less-than-fair-value sales to special duties.

Statement of Commissioner Stern in *ITC Changed Circumstances Determination* 45 Fed.Reg. 39581 at 39587 (emphasis added).

> Consequently, the Commission's task under section 751 is to view the relevant facts and circumstances as they currently exist to determine whether an industry in the United States *would suffer* material injury, or the threat thereof, or whether the establishment of an industry *would be* materially retarded if the existing antidumping duty order were not in effect.

Statement of Alberger and Calhoun *ITC Changed Circumstances Determination* 45 Fed.Reg. 39581 at 39585 (emphasis added).

The commissioners specifically refused to give retroactive effect to the revocation of a determination of injury, "because the statutory remedy [for the injury] is already in place" in the form of special duties. Statement of Commissioner Stern, *supra.* To hold that the prospective revocation of the finding of injury bars the assessment of those special duties would be inconsistent with, and undermine the rationale for, the Commissions interpretation of its authority and responsibility when conducting a changed circumstances review under § 751 of the Tariff Act of 1930 (19 U.S.C. § 1675(b)). Moreover, in their reply brief, "plaintiffs stipulate to the prospective nature of revocations." *Plaintiff's Reply Brief* at 7.

■ Accordingly, this Court holds that a revocation of a determination of injury is prospective in that it does not revoke the determination of injuries for entries prior to the effective date of the revocation.

■ Plaintiffs further contend that the subsequent revocation prohibits the assessment of duties on prior entries because it is contrary to section 1673 of U.S.C. Title 19, which states:

> **§ 1673. Imposition of antidumping duties**
>
> If—

(1) the administering authority determines that a class or kind of foreign merchandise *is* being, or is likely to be, sold in the United States at less than its fair value, and

(2) the Commission determines that—

(A) an industry in the United States—

(i) *is* materially injured, or

(ii) is threatened with material injury, or

\* \* \* \* \*

(Emphasis added).

Melex contends that the use of the word "is" in section 1673 dictates that an affirmative injury finding must remain in effect at the time of assessment. *Plaintiffs Brief* at 20. This narrow interpretation is unsupported by case law. In *Royal Business Machines, Inc. v. United States* 1 CIT 80, 507 F.Supp. 1007, 1013 (1980) this Court observed that a finding under 19 U.S.C. § 1673 is "an unambiguous statement that the class or kind of merchandise found to *have been sold* at less than is fair value and to *have materially injured* a domestic industry must be subjected to an antidumping duty." (Emphasis added). *See also City Lumber Co. v. United States* 290 F.Supp. 385, 392 (Customs Court 1968), *aff'd* in Appellate Term, 64 Cust.Ct. 826, 311 F.Supp. 340 (1970), *aff'd*, 59 CCPA 89, 457 F.2d 991 (1972). The administrative process which reviews the cost and price data for merchandise which may be subject to antidumping duties, as in the instant case, inevitably requires the analysis of events which have already occurred. This is an inherent part of the statutory scheme of the antidumping laws.

Lastly, since U.S. statutes prevail in any conflict with the GATT, it is not necessary to decide whether this statutory scheme is contrary to the GATT. Plaintiffs argue that an assessment in the instant case would be in violation of the GATT which requires a current injury finding for antidumping duties to be assessed. *Plaintiffs' Brief* at 19. Plaintiffs' argument fails because the specific statutory scheme which allows the subsequent liquidation during a review under § 1675 was included in the legislation which implemented U.S. obligations under the GATT Antidump-

ing Code and that legislation specifically states that U.S. law prevails over any conflict with the GATT Antidumping Code.

The statutory scheme whereby the finding of § 1673 are subsequently reviewed under § 1675 was included in the 1979 legislation, Public Law 96–39, 1979, which implements U.S. obligations under the GATT Antidumping Code. The inclusion of these sections in the implementing statute indicates that they are part of the "necessary and appropriate changes in United States law to implement the results of the Tokyo Round of Multilateral Trade Negotiations (MTN)" which included the GATT Antidumping Code. Senate Report No. 249, 96th Cong., 1st Sess. at 1 (1979), U.S.C.C.A.N.1979, pp. 381, 387. In addition to this indication that the statutory scheme is consistent with the GATT Antidumping Code, Section 3 of Public Law 96–39, 1979, (19 U.S.C. § 2504) states:

No provision of any trade agreement approved by the Congress under section 2(a), nor the application of any such provision to any person or circumstance, which is in conflict with any statute of the United States shall be given effect under the laws of the United States.

19 U.S.C. § 2504 (1988). *See also* 19 U.S.C. § 3512 (similar provision for Uruguay Round Agreements).

In sum, the Court finds that the 1992 determination by Commerce to conduct a review under 19 U.S.C. § 1675 on these unliquidated entries made before the prospective revocation of the finding of injury in 1980 was reasonable, supported by substantial evidence on the record and in accordance with United States law.

### B. *Commerce's retroactive application of current law to the entries under review.*

In regard to these pre–1980 entries, plaintiffs contest the calculation of fair market value (FMV) using methodologies which were established by the Trade Agreements Act of 1979 and the Trade and Tariff Act of 1984 (hereinafter the 1979 amendments and the 1984 amendments). In their brief, plaintiffs state that:

The FMVs provided by Treasury to Melex were based on computations made according to the then existing regulations and practices. These regulations and practices differed from the approach taken by the Department in the instant review in the following respects, each of which tends to increase the FMVs to the detriment of Melex. Adjustments for circumstances of sale were not made to constructed value. Commerce's addition of credit and warranty expenses to constructed value for this review is based on a change in the law effective in 1980 that included constructed value under foreign market value. Before 1980, circumstances of sale adjustments were not made to constructed value. Further, in 1980 comparisons of U.S. sales with FMVs were made on the date of exportation rather than on date of first sale in the United States to an unrelated buyer. Exporter's sales price ("ESP") sales were not compared as of date of sale until a change in the law was made in 1984.

*Plaintiffs' Brief* at 24.

In response to the assertion that Commerce applied the current methodologies retroactively to the detriment of Melex, the government states that "Commerce is statutorily required to apply the current methodologies contained in the antidumping statute to Commerce's administrative review of Melex's entries." *Defendant's Brief* at 22. In its brief, the government asserts that "the statutory language of both [the 1979 and 1984] amendments demonstrates that Congress intended that the portions of the amendments affecting the calculation of FMV apply retroactively to previous entries." *Defendant's Brief* at 24.

The issue of whether statutes will be applied to events preceding the effective date of the legislation was recently addressed by the Court of Appeals, Federal Circuit which stated:

In the absence of statutory direction, this court avoids retroactive application of legislative changes. *See Ralden Partnership v. United States*, 891 F.2d 1575, 1578 (Fed. Cir.1989). '[C]ongressional enactments ... will not be construed to have retroac-

tive effect unless their language requires this result.'

*OAO Corp. v. Johnson*, 49 F.3d 721, 725 (Fed.Cir.1995) quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988).

The requirement of *Bowen* that congressional intent must clearly be shown to overcome the presumption against retroactive application of legislation was reaffirmed by the Supreme Court in the 1994 decision, *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994):

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf,* at ——, 114 S.Ct. at 1505. Under this analysis, applying current methodologies to the entries which were made prior to the effective dates of the 1979 and 1984 amendments would "increase a party's liability for past conduct." *Id.*

In support of the alleged congressional intent of the retroactive application of the 1979 and 1984 amendments to Title VII of the Tariff Act of 1930, Commerce provides the following analysis:

Pursuant to the Transitional Rule of the 1979 Trade Agreements Act, dumping findings issued under the 1921 Antidumping Act and in effect up to January 1, 1980 "shall remain in effect, subject to review under section 751 of the Tariff Act of 1930." Trade Agreements Act of 1979, Pub.L. No 96–39, § 106, 93 Stat. 144, 193 (1979). The 1979 Act also provided that

the amendments to the antidumping duty law contained in the Act are to take effect on January 1, 1980, except as otherwise provided. Pub.L. No. 96–39, § 107, 93 Stat. 144, 193. The amendments concerning the determination of FMV did not contain any exceptions from the general effective date.

In 1984, the antidumping duty statute was amended again. Pub.L. No. 98–573, 98 Stat. 2948 (1984). The 1984 Act further amended the section of the antidumping statute concerning the calculation of FMV, Pub.L. No. 98–573, § 615, 98 Stat. 2948, 3036, and provided that the effective date of the amendments to the FMV portion of the statute was October 30, 1984, Pub.L. No. 98–5783, § 626(a), 98 Stat. 2948, 3042.

*Defendant's Brief* at 16.

The Supreme Court recently construed the meaning of the "effective date" clause of legislation in *Landgraf, supra.* The Court interpreted the issue whether the Civil Rights Act of 1991 would be retroactive or prospective. The "effective date" language of that bill is similar to the effective date language of the 1979 and 1984 amendments to the antidumping law. In its discussion of the effective date of the Civil Rights Act, the Supreme Court observed:

> Section 402(a), the only provision of the Act that speaks directly to the question before us, states:
>
> > "Except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment."
>
> That language does not, by itself, resolve the question before us. A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.

*Landgraf,* at ——, 114 S.Ct. at 1493.

In addition, this Court has recently recognized that the 1921 Act, and not the subsequent amendments, is applicable to unliquidated entries made prior to the effective dates of the 1979 and 1984 amendments to the Act:

> Further, Commerce has frequently announced that the 1921 Act applies to unliquidated pre–1980 entries. The Court has previously recognized that the substantive provisions of the 1921 Act apply to unliquidated entries made prior to 1980. See *Timken Co. v. United States,* 10 CIT 86, 96 n. 5, 110, 630 F.Supp. 1327, 1336 n. 5, 1347 (1986).

*Koyo Seiko v. United States,* 19 CIT ——, 893 F.Supp. 52 (1995) (citations omitted).

■ This Court finds that the application of the 1979 and 1984 amendments to entries made prior to the effective dates of those amendments would be the retroactive application of those amendments which is not clearly required by statutory language, legislative history or administrative practice. Like the Court in *Landgraf,* this Court finds that the language cited by defendant does not support an unambiguous intent to retroactively apply the statutes. Such a position is consistent with the holdings of the CAFC decision in *OAO Corp. v. Johnson* and this Court in *Koyo Seiko.* Accordingly, the Court holds that the application of the methodological changes of the 1979 and 1984 amendments to the formulation of FMV of entries which occurred prior to 1980 was not required by clear congressional intent and is therefore not in accordance with law.[1]

### C. *Commerce's assessment made contrary to statements made by Treasury officials outside of the Administrative review process.*

Plaintiffs claim that Commerce should not repudiate "its own prior official assurances and findings and those of its predecessor administering authority, the U.S. Treasury

---

**1.** It may also be noted that if the retrospective application of changes to the Antidumping Act is avoided in the instant case, the plain meaning and effect may still be given to the Transitional Rule of the 1979 Trade Agreements Act, which states that dumping findings issued under the 1921 Antidumping Act and in effect up to January 1, 1980 "shall remain in effect, subject to review under section 751 of the Tariff Act of 1930." This is because § 1675 reviews can, and frequently are, conducted to review outstanding orders to determine the rate at which present and future entries should be assessed.

Department, that the sales subject to review were not made at less than fair value." *Plaintiffs' Brief* at 2. Plaintiffs contend that they relied upon these assurances to their detriment.

The defendant argues that:

> To give binding effect to advisory statements [made before or during the time of the entries] would circumvent the detailed administrative procedures Congress outlined in the antidumping law. Therefore, any assurances made by Commerce or Treasury officials outside of a full administrative review cannot be binding because "government employees have no authority to commit the government to actions that contravene a statute." *Allied Tube & Conduit Corp. v. United States*, 898 F.2d 780, 785 (Fed.Cir.1990).

*Defendant's Brief* at 18.

■ In their briefs plaintiffs try to avoid the characterization of their claim as an estoppel. However, it is apparent to the Court that an estoppel is what they seek. Courts have recognized the longstanding rule that "ordinarily the government may not be estopped because of erroneous or unauthorized statements of government employees when the asserted estoppel would nullify a requirement prescribed by Congress." *OPM v. Richmond* 496 U.S. 414, 418–419, 110 S.Ct. 2465, 2468, 110 L.Ed.2d 387 (1990) *quoting* 862 F.2d 294, 296 (Fed.Cir.1988). "[I]t is well settled that the Government may not be estopped on the same terms as any other litigant" *Heckler v. Community Health Services*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). If plaintiffs were to receive the requested relief, the government would be estopped from conducting a review under 19 U.S.C. § 1675 of these unliquidated entries. This "asserted estoppel would nullify a requirement prescribed by Congress." *OPM v. Richmond*, 496 U.S. at 418–419, 110 S.Ct. at 2468. This Court holds that the prior statements by Treasury officials in this case may not estop the Government from conducting a review under § 1675 of unliquidated entries.

**D.** ***The use of the Spanish rate of inflation rather than the Polish rate of inflation for the adjustment of Spanish costs used in the constructed value analysis.***

Plaintiffs contend that Commerce erred in using Spanish inflation rates to adjust the FMVs derived from a "factors of production" study conducted by the CREA consulting firm in 1977 (the "CREA Study") to establish the costs of producing a golf car in a market economy country of a comparable level of economic development. Plaintiffs allege that Polish, rather than Spanish rates of inflation are more appropriate. In their reply brief, plaintiffs "regard the inflation rates in Poland during the review period to have been free of the kind of distortions that require use of surrogate market-economy country valuation." *Plaintiffs Reply Brief* at 18. Plaintiffs have not provided any justification for this belief. Plaintiffs also contend that the "extreme rates of inflation in Spain during the review period resulted precisely in the kind of unrealistic valuation that the referenced cases intended to overcome." *Plaintiffs Reply Brief* at 19.

Inflation is measured by the change of a price index. It is, by definition, a change in the aggregate price levels within an economy. Inflation is a result of market forces within an economy. Paul A. Samuelson and William D. Nordhhaus, Economics, 306 (13th ed. 1989). "Specifically, Commerce's task in a nonmarket economy investigation is to calculate what a producer's costs or prices would be if such prices or costs were determined by market forces." *Tianjin Machinery Import & Export Corp. v. U.S.*, 16 CIT 931, 806 F.Supp. 1008, 1018 (1992).

■ According to the administrative record in this case, the Spanish rates of inflation used by Commerce produced a price increase of 49% from July, 1977 to the year 1980. Public Record microfilm frames ("P.R.") at 001310. In contrast, plaintiffs seek to substitute the Polish rates of deflation during the same period which equaled a negative 8.5% during the same period. P.R. at 001311. Although Spain experienced inflation during the period of review, it must be recalled that after the oil crisis, the 1970s was a period of

high inflation in market economies throughout the world. It is difficult to comprehend why a rate of deflation from a non-market economy is a more appropriate measure of the resultant FMVs. The Court agrees with the defendant's assertion that "if the underlying prices that determine a country's rate of inflation are unreliable then the resultant rate of inflation is also unreliable." *Defendant's Brief* at 31. Accordingly, the Court concludes that Commerce's adjustment of Spanish costs by the Spanish rate of inflation was reasonable and in accordance with law.

### E. *Calculation of Melex's credit expenses.*

█ Melex argues that Commerce erred in using recalculated credit costs rather than the actual credit costs as supplied by Melex in its case and reply briefs during the administrative hearing. *See Plaintiffs' Brief* at 29, and *Plaintiffs' Reply Brief* at 19. In light of the holding that the provisions of the 1921 Act are applicable to the instant case, the addition of credit expenses to constructed value for this review would be inappropriate because "differences in circumstances of sale" adjustments to foreign market value were only made applicable to constructed value by the 1979 Amendments. *Compare* § 161 *et. seq.* of 19 U.S.C. (1976) to the 1979 amendments in Public Law 96–39 § 101, § 773 (1979) (19 U.S.C. § 1677b). *See also* Senate Report No. 249, 96th Cong., 1st Sess. at 95 (1979), U.S.C.C.A.N.1979, p. 481. ("The bill extends the concept of 'foreign market value' to embrace both the existing terms 'foreign market value' and 'constructed value' "). Accordingly, this issue is remanded to Commerce so that it may reevaluate its findings in light of the holding regarding the applicability of the 1921 Act.

### F. *Use of Petitioner's Information to Determine the Costs of Producing Melex's 4–Wheel Golf Cars.*

Plaintiffs contend that Commerce erred by using petitioner's data to determine the cost differential between 4–wheel and 3–wheel golf cars. The CREA Study, which used Polish factors of production as valued in Spain, only analyzed 3–wheel golf cars. *Plaintiffs' Brief* at 31.

In order to supplement the CREA study, Plaintiffs provided 4–wheel cost data prior to the issuance of the Preliminary Results and four months prior to the publication of Commerce's *Final Review* of March 25, 1992. *Id.* at 32. Neither the Preliminary, nor the Final Determination found the submission of this information to be untimely.

Commerce rejected Melex's 4–wheel cost differential data, alleging that it was uncertain as to whether the 4–wheel cost data provided by Melex was constructed using materials which were priced in Polish currency and then converted into Spanish currency, or whether the additional materials and labor was identified and then priced using Spanish costs exclusively. Commerce claims that because of this uncertainty, Melex has failed to clearly comply with Commerce's request that they "provide information from a market economy country for the production costs for each model of golf car sold by Melex during the period of review." *Defendant's Brief* at 35.

The cause of Commerce's uncertainty is not readily apparent to the Court, especially when the November 25, 1995 submission is seen in light of the discussion of this issue in a prior meeting between Melex and Commerce and the subsequent explication of the source and meaning of this data in Melex's briefs in the Administrative Review. *See* P.R. at 001387–8.

Defendant relies upon two cases for the proposition that the plaintiffs bear a very high burden in "ensur[ing] that Commerce understands and correctly uses any information that is submitted by the respondent." *Defendant's Brief* at 35. The cases that defendant cites are *Asociacion Colombiana de Exportadores v. United States*, 13 CIT 13, 704 F.Supp. 1114 (1989), and *Neuweg Fertigung GmbH v. United States*, 16 CIT 724, 797 F.Supp. 1020 (1992). However, both of these are factually distinguishable. In *Asociacion Colombiana de Exportadores* and *Neuweg*, the plaintiffs' questionnaire responses were seriously deficient and delinquent. In *Asociacion Colombiana* the information at issue was submitted only one

month before the final determination, after several "deficiency letters" were sent to the party. *Asociacion Colombiana de Exportadores*, 704 F.Supp. at 1122–23. In *Neuweg*, the respondent failed to provide data which would allow a match between home market and U.S. sales until after the publication of the Final Determination despite the fact that it was put on notice of the problem at a conference soon after the publication of the Preliminary Results. *Neuweg, supra*, at 1023–24.

In the instant case, the record reflects that Melex attempted, in good faith, to cooperate in the review. As in a recent case before the Court, *Mitsui v. U.S.A.*, 18 CIT ——, Slip Op. 94–44, 1994 WL 91914 (March 11, 1994), the plaintiffs were not given any notice of the alleged deficiencies in the submission or a meaningful opportunity to correct them. *Id.* at 30–32. As in *Mitsui*, plaintiffs were expected to provide data covering several years of sales which had occurred many years ago:

> In extraordinary cases such as the one at bar, Commerce should have anticipated substantial difficulty in obtaining timely cogent information. A reasonable and meaningful opportunity would have included extensions of time proportional to the additional annual periods requested and some indication of whether the information submitted satisfied the criteria for Commerce's analysis. No party is as well placed as Commerce to know what information is required for the methodology it chooses in any particular review. This special knowledge imposes on Commerce an obligation to reasonably insure that the subject of the investigation is informed as to those requirements.

*Id.* at 30–31.

■ Despite Melex's efforts to comply with Commerce's requests for information, Commerce did not make any effort to "[give] some indication of whether the information submitted was satisf[actory] [or to] . . . reasonably insure that the subject of the investigation is informed as to those requirements." *Id.* Upon due consideration, the Court finds that Commerce did not apply reasonable procedures in its attempt to solicit and clarify information provided by Melex. Accordingly, Commerce's determination to resort to BIA was not in accordance with law. This issue is remanded for Commerce to apply the four-wheel cost differential data provided by Melex rather than the data provided by E–Z–Go.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce so that it may reevaluate its findings in light of the holding that: (1) the methodologies of the 1921 Act, and not subsequent amendments, is applicable to unliquidated entries made prior to the effective dates of the 1979 and subsequent amendments to the antidumping law; (2) Commerce's determination to resort to BIA was not in accordance with law. Commerce must apply the four-wheel cost differential data provided by Melex rather than the data provided by E–Z–Go. Commerce's determination is affirmed in all other respects. Remand results are due within 90 days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within 45 days thereafter.

### ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("ITA"), that it may reevaluate its findings in light of the holding that: (1) the methodologies of the 1921 Act, (and not subsequent amendments), is applicable to unliquidated entries made prior to the effective dates of the 1979 and subsequent amendments to the antidumping law; (2) Commerce's determination to resort to BIA was not in accordance with law. Commerce must apply the four-wheel cost differential data provided by Melex rather than the data provided by E–Z–Go; and it is further

**ORDERED** that the ITA's determination is affirmed in all other respects; and it is further

**ORDERED** that Commerce's determination is affirmed in all other respects. Remand results are due within 90 days of the date this order is entered. Any comments or responses by the parties to the remand results are due within 45 days thereafter.