ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| D&J Machinery, Inc. | ) ASBCA No. 62019 |
| | ) |
| Under Contract No. W912EP-15-C-0022 | ) |

APPEARANCES FOR THE APPELLANT:    Lochlin B. Samples, Esq.
                                                          Jeanne M. Harrison, Esq.
                                                          Karl Dix Jr., Esq.
                                                            Smith, Currie & Hancock LLP
                                                            Atlanta, GA


APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
                                                                  Engineer Chief Trial Attorney
                                                                Bruce E. Groover, Esq.
                                                                Codee L. McDaniel, Esq.
                                                                Susan E. Symanski, Esq.
                                                                  Engineer Trial Attorneys
                                                                  U.S. Army Engineer District, Jacksonville


OPINION BY ADMINISTRATIVE JUDGE WILSON ON
APPELLANT'S MOTION FOR SUMMARY JUDGMENT AND THE
GOVERNMENT'S MOTION TO STRIKE

        Appellant, D&J Machinery, Inc., brings this appeal alleging that the United
States Army Corps of Engineers (USACE or government) provided defective contract
specifications, which then caused appellant to incur additional costs in an attempt to
comply with the contract specifications. Appellant moves for summary judgment,
arguing that the government breached an implied warranty that satisfactory contract
performance would result from adherence to contract specifications. The government
counters that the contract specifications at issue were performance specifications not
design specifications, and no warranty existed. The government also moves to strike
portions of appellant's reply brief, which purportedly allege a new claim that USACE
breached its duty to disclose superior knowledge related to design of the anchor block
system under the above-referenced contract. Appellant counters that the government's
contention that it raised a new claim in its reply brief fails to distinguish a new
argument from a new claim. For the reasons stated below, appellant's motion is
denied and as such, the government's motion to strike is rendered moot.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1.  On September 18, 2015, the Army Corps of Engineers awarded Contract No.W912EP-15-C-0022 to D&J Machinery.  The firm-fixed-price contract was intended to improve water deliveries and the historical natural hydrologic conditions within the Shark River Slough, through construction of control structures and a seepage canal at the Everglades National Park, Miami, Florida.  (Compl. at 2; R4, tab 2 at 293-94)

2.  Principal elements of this contract, as they apply to this appeal, were the construction of three gated concrete control structures, completion of seepage canal C-358, and the backfill and reconstruction of a pump station.  Each control structure was to be equipped with a manually operated double leaf slide gate system, 84" diameter High Density Polyethylene (HDPE)[1] pipe with tie-down anchor blocks, handrails, an access hatch, and lightning protection system.  (R4, tab 2 at 293)

3.  The project was designed by the Jacksonville District, U.S. Army Corps of Engineers (R4, tab 2 at 235), with performance-based elements (*see e.g.*, R4, tab 2 at 482, 511 § 3.1.4, 512 § 3.2.2).

4.  The contract specifications include Section 03 31 01.00 10 – CAST-IN-PLACE STRUCTURAL CONCRETE FOR CIVIL WORKS.  Section 1.2 – Design Requirements, which requires the contractor to "select concrete mixture proportions so that the strength and W/C requirements are met.  Submit concrete mixture proportions as determined by the contractor and submitted for review."  (R4, tab 2, at 498) Section 1.3 – Submittals, requires that government approval was required for elements noted with a "G".  Concrete mixture proportions, underwater concrete methods and equipment, and cementitious materials, admixtures, and curing compound were all designated with a "G".  (R4, tab 2 at 501-02)  Section 3.2.2 – Placing Concrete Underwater reiterates the requirement for approval of the methods and equipment and states, "[d]eposit concrete in water by a tremie or concrete pump" (R4, tab 2 at 512). Flowable fill is not referenced in either sections 1.3 or 3.2.2.

5.  Section 03 31 01.00 10 – CAST-IN-PLACE STRUCTURAL CONCRETE FOR CIVIL WORKS, references flowable fill in Part 2 – PRODUCTS, 2.1 – Materials.  Section 2.1.8 Flowable Fill states in its entirety, "[f]lowable fill shall be non-excavatable meeting FDOT standards under Section 121."  (R4, tab 2 at 507)

6.  Contract drawings C-08, S-02, and S-03 reflect that HDPE pipe would be attached to each of the three control structures.  The drawings also show that flowable

---

[1] See, Terms and Abbreviations (R4, tab 3 at 671).

fill would be placed between and around each HDPE pipe, with required elevations for the flowable fill. (R4, tab 3 at 685, 690-91)

7. Flowable fill, as discussed in contract drawings C-8, S-02, and S-03, refer the contractor to Division 31 – EARTHWORK for guidance (R4, tab 2 at 569-79). Flowable fill is not discussed by name in Division 31 – EARTHWORK (R4, tab 3 at 569-79).

8. Flowable fill is commonly used as a substitute for earthen backfill and the contract specifications did not include guide specifications for flowable fill (app. mot. at 4-5; app. mot. at ex. A, Higgins declaration ¶¶ 16-17; ex. B, Swindle declaration ¶¶ 16-18).

9. Drawing S-01 of the contract contains structural notes on the installation of the HDPE pipes, including "due to the natural buoyancy of the HDPE culverts, the culverts shall be lowered into place with the aid of weights and by filling the pipes profile with water" (R4, tab 3 at 689). The structural notes do not otherwise describe any suggestions or guidance relating to installation or project completion.

10. Drawing S-02 is a general plan for the contract that reflects structural details for the final product. It does not reflect any specifications for the process of installation or construction of any element. (R4, tab 3 at 690)

11. On December 19, 2016, appellant submitted a request for approval, ENGForm 4025, for "Flowable Fill Concrete Mixture" with two different concrete mix design proposals, one excavatable and one non-excavatable (R4, tab 24 at 4398-400). The government replied on January 10, 2017 via ENG Form 4025-R and stated "in accordance with Contract Specification Section 03 31 01.00 10, Paragraph 2.1.8, Flowable fill shall be "non-excavatable" meeting FDOT standards under Section 121. (R4, tab 25)

12. On March 30, 2017, the government sent Serial Letter C-0029 to appellant indicating that its "representative observed that there was an apparent failure to the formwork presumably allowing flowable fill to be discharged . . . [and] requests that you provide an action plan addressing [the] proposed measures to correct the work and achieve contract compliance" (R4, tab 26).

13. An April 13, 2017 response to Serial Letter C-0029 from appellant states, among a detailed explanation of work happening to remedy the flowable fill formwork failure, that appellant's "review of the contract plans and specifications as well as confirming direction from USACE leads us to the ultimate conclusion that the contractual requirements for the underwater placement of flow fill is defective and was

3

the primary contributing factor to the flowable fill formwork failure" (R4, tab 28 at 4405).

14. On April 17, 2017, the government responded to appellant's Serial Letter S-013 and requested additional information regarding the flowable fill formwork failure. The government additionally noted: "the government cannot support or understand [appellant's] allegation of concluding that 'contractual requirements related to underwater placement of flow fill is defective and was the primary contributing factor to the flowable fill formwork failure'". (R4, tab 29 at 4407)

15. A May 15, 2017 Request for Information Report (RFI) from appellant requested approval for installation and backfilling of the HDPE culverts with flowable fill. The government replied on May 19, 2017, and noted that the "[c]ontract does not have any restrictions on the means and method for placement of flowable fill as long as they meet the Contract Specification Section 03 31 01.00.10, paragraph 2.1.8" (R4, tab 34 at 4447).

16. Appellant submitted a certified claim to the Contracting Officer on June 6, 2018. On January 3, 2019 the government denied appellant's claim in its entirety. (R4, tabs 46, 50)

17. On March 27, 2019, appellant timely submitted a notice of appeal to the Board, which was docketed as ASBCA No. 62019.

DECISION

Appellant moves for summary judgment, contending that defective specifications in the contract led to additional costs incurred by appellant in the execution of the contract (app. mot. at 1-2).[2] Appellant argues that the government caused delay and cost overruns by including defective specifications in the contract and is therefore "deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications . . ." (app. mot. at 1-2, citing *Essex Electro Engineers*, *Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000)).

A party is entitled to summary judgment if, as the moving party, it has shown that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mingus Constructors*, *Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Irrespective of the type of

---

[2] Appellant also indicates in its motion that it is entitled to recover additional costs as a result of "constructive changes to the contract". However, appellant fails to present any argument relating to a constructive change to the contract and, as such, the Board will not address it further in this decision.

claim being raised, the applicable substantive law identifies which facts are material and might affect the outcome of the appeal, thus precluding the entry of summary judgment. *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 248 (1986).

We view such facts in the light most favorable to the non-moving party, accepting its version of facts as true and drawing all reasonable factual inferences in its favor. *Liberty Lobby*, 477 U.S. at 255; *C. Sanchez and Son*, *Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993). However, the non-moving party must set forth specific facts showing the existence of a genuine factual dispute; conclusory statements and bare assertions are not sufficient. *Mingus*, 812 F.2d at 1390-91; *Pure Gold, Inc. v. Syntex* (*U.S.A.*), *Inc*., 739 F.2d 624, 626 (Fed. Cir. 1984). Our job is not "'to weigh the evidence and determine the truth of the matter,' but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors*, *Inc*., ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Liberty Lobby*, 477 U.S. at 249).

Moving to the applicable law and material facts specific to this appeal, "when the government provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover all of the costs proximately flowing from the breach." *Essex Electro Engineers*, *Inc. v. Danzig*, 224 F.3d 1283, 1289 (1970) (*See, e.g.*, *United States v. Spearin*, 248 U.S. 132, 136 (1918); *USA Petroleum Corp. v. United States*, 821 F.2d 622, 624 (Fed.Cir.1987); *Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 670 (1979)). However, it is crucial to determine what type of contract specifications are at issue, design specifications or performance specifications.

The difference between performance specifications and design specifications is well established. Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 689 (1969). Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is "required to follow them as one would a road map." *Id.* "Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced." *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987) (citing *United States v. Spearin*, 248 U.S. 132, 137 (1918)).

Therefore, in order to determine if summary judgment is appropriate in this appeal, the first issue the Board must address is whether there is a genuine issue of material fact in dispute relating to the type of contract specifications at the center of

this appeal.  *See, Stuyvesant Dredging Co.*, 834 F.2d at 1582.  For the purposes of this summary judgment motion, when determining whether there are defective specifications in a contract, the issue is not whether the specifications are specifically labeled design specifications, but how much discretion the specifications give to the contractor in execution of the contract.  This is then a question of contract interpretation, which is a matter of law for this Board to decide.  *Blake Constr. Co., v. United States*, 987 F.2d 743, 746 (1993) (citing *R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1571 (Fed.Cir.1990)).  Contract interpretation is a question of law that generally is amenable to summary judgment.  *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002).  However, the caveat to this general statement relates to whether there is an ambiguity that requires the weighing of extrinsic evidence.  *Dixie Constr. Co.*, ASBCA No. 56880, 10-1 BCA ¶ 34,442 at 169,918.

Here, however, we conclude that the contract is ambiguous with regard to the type of specification set forth in the contract.  Moreover, there is a genuine issue of material fact on the initial hurdle in considering appellant's motion; that is whether the specifications at the center of appellant's argument are design or performance specifications, as well as appellant's reasonable reliance on its interpretation of said specifications.  *See Celotex Corp.*, 477 U.S. at 322; *Mingus Constructors, Inc.*, 812 F.2d at 1390.  Appellant's argument is centered on two tasks of the overall contract.  Appellant first alleges that the government treated flowable fill like concrete in drafting the contract specification related to flowable fill; and further that appellant interpreted the contract specification as a design specification regarding placement of underwater concrete, which also applies to the placement of underwater flowable fill (app. mot. at 13-14).  The government argues that the applicable contract specifications were performance specifications (gov't resp. at 11).  The government further argues that because flowable fill was a minor feature of the overall project, the government left the design and placement up to the contractor's means and methods, providing the contractor with an objective but with the contract specifications silent on how the objective would be achieved (gov't resp. at 12).

The status as a design or performance specification of the flowable fill is a material fact, and at this stage of the legal analysis, the most important material fact, in determining whether there was an implied warranty and then, if so, if said warranty was breached.  The parties do not agree on whether the specifications surrounding the treatment of and the application of flowable fill were design or performance specifications.  (SOF 9-15)  It is clear that the initial hurdle to the analysis of this claim, whether the specifications relating to flowable fill were design or performance specifications, is in dispute.  Based on the record in its current state, we are unable to determine the answer to this question without further evidence.  Appellant has failed to show that there are no genuine issues of material fact, specifically has not shown that there is not a genuine issue of material fact relating to the type of contract

6

specification, and therefore appellant's contentions must fail. *Celotex Corp.*, 477 U.S. at 322; *Mingus Constructors*, *Inc.*, 812 F.2d at 1390.

The second piece of appellant's argument is that the design for the anchor blocks was incomplete and the contract specifications applicable to the anchor blocks were defective (app. mot. at 15-16). The Board notes that appellant's description of the anchor block design appears on its face to reference defective specifications; however, the Board interprets this element of appellant's argument also as a dispute about what type of specifications were included and which party shall take responsibility for delays and additional cost. Appellant states that the government's anchor block specification was a "classic design specification – the drawings detailed the specific quantity of anchor blocks, the location, the design, and the required anchor band rating to counteract uplift." (App. mot. at 15-16) Further, appellant contends that the design drawings represented that the government was providing a fully designed anchor system when it was not (app. mot. at 16; app. reply at 3).

The government counters that it did not need to make a note to the bidders what the anchor blocks were "*not* designed for because the plans and specifications clearly detailed the requirements for the anchor block system" (gov't resp. at 15-16 (emphasis in original)). Further, the government argues that contract specifications were silent on the need of a system to secure the pipes in place during the placement of flowable fill because the design and placement was a performance specification, not a design specification (gov't resp. at 16).

Again, the type of contract specification is central to this dispute, and therefore material to the analysis of whether a warranty was established and breached (SOF 9-15). Appellant has not shown that there are no genuine issues of material fact for this part of the claim either. *Celotex Corp.*, 477 U.S. at 322; *Mingus Constructors*, *Inc.*, 812 F.2d at 1390. Accordingly, summary judgment is not appropriate.

As we have concluded that there are material facts in dispute, we will not address appellant's additional arguments in its motion for summary judgment relating to its superior knowledge allegations and the government's subsequent motion to strike.

7

<u>CONCLUSION</u>

Appellant's motion for summary judgment is denied.

Dated: April 19, 2022

_____
OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

_____
JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

_____
RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62019, Appeal of D&J Machinery, Inc., rendered in conformance with the Board's Charter.

Dated: April 19, 2022

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals